# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| T.L., a Minor, By and Through His Parents | : | |
| and Guardians, K.L. and K.L., et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 15-0885 |
| | : | |
| LOWER MERION SCHOOL DISTRICT, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

**Tucker, C.J.**                                                                 **June 20, 2016**

Presently before the Court are Plaintiffs' Complaint (Doc. 1), Defendant's Answer to the

Complaint (Doc. 6), Plaintiffs' Motion for Judgment on the Administrative Record (Doc. 12),

Defendant's Response in Opposition (Doc. 13), Plaintiffs' Reply (Doc. 14), Defendant's Sur-

Reply (Doc. 15), Plaintiffs' Additional Exhibits 1 and 2 (Doc. 18), and the record of this case.

Upon consideration of the parties' submissions and exhibits and for the reasons set forth below,

this Court DENIES Plaintiffs' Motion.

## I.    FACTUAL BACKGROUND[1]

Plaintiff T.L., a minor formerly enrolled in Gladwyne Elementary School, and his

parents, Plaintiff K.L. and Plaintiff K.L. (collectively "Plaintiffs") filed a complaint in this Court

---

[1] The Hearing Officer rendered her decision on November 26, 2014. Def. Answer, Exh. A, Doc 6
("HOD").  District courts must "consider the '[f]actual findings from the administrative proceedings ...
prima facie correct[.]'"  *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 241 (3d Cir. 2009) (quoting *Shore
Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)).  Courts may depart from the
administrative proceeding's factual findings but "must explain its reasons for departing from them."  *Id.*
Accordingly, this Court finds no reason to depart from the Hearing Officer's factual findings.  Therefore,
this account of the facts is largely based upon the Hearing Officer's factual findings.

to challenge the decision of Hearing Officer Dr. Linda M. Valentini of the Office of Dispute Resolution (the "Hearing Officer") denying Plaintiffs tuition reimbursement from Defendant Lower Merion School District ("Defendant" or "Lower Merion") (the "Complaint").  Plaintiffs allege that Defendant failed to provide T.L. with a free appropriate public education and thus violated the Individuals with Disabilities Education Act ("IDEA") and § 504 of the Rehabilitation Act.

A.  *2009-2010 Academic Year*

In 2009, T.L. began Kindergarten in Lower Merion.  Throughout the year, T.L. "experienced reading problems and was referred to a District certified reading specialist."  Def. Answer, Exh. A ¶ 1, Doc 6 ("HOD").  Defendant provided T.L. with two thirty-minute small group supplemental reading sessions per week to help with the reading difficulties.

B.  *Summer 2010*

In the summer of 2010, K.L. and K.L. arranged for T.L. to have private tutoring in reading.

C.  *2010-2011 Academic Year*

In the fall of 2010, T.L. began first grade and continued to experience reading difficulties. Additionally, T.L. began exhibiting difficulty with writing.  In response to these difficulties, Defendant implemented an "Action Plan" to address T.L.'s difficulty with reading and writing. HOD ¶ 3. Under the Action Plan, Defendant provided T.L. with four to five thirty-minute small group supplemental reading sessions per week with the certified reading specialist. *Id.*

D.  *Summer 2011*

In the summer of 2011, K.L. and K.L. arranged for T.L. to have private tutoring.

*E.  2011-2012 Academic Year*

In the fall of 2011, T.L. began second grade and continued to experience difficulties with reading and writing and also began to exhibit difficulty with math.  In the beginning of the school year, Defendant implemented another "Action Plan" to address T.L.'s difficulty with reading and math.  *Id.* ¶ 6.  Under the Action Plan, T.L. received "preferential seating, pre-teaching during small group, scribing when [T.L.] became frustrated, and one-on-one instruction with [the] teacher during independent time, particularly during language arts."  *Id.* ¶ 7.  Although Lower Merion made modifications to T.L.'s classroom experience, "by early November of 2nd grade [Lower Merion] concluded that despite supplemental intervention under an Action Plan and making some progress in response to intervention [T.L.] was still struggling academically, particularly in literacy."  *Id.* ¶ 8.  On November 7, 2011, Defendant met with K.L. and K.L. to discuss T.L.'s difficulties and suggested an evaluation.

1. Evaluation of T.L.

At the time Defendant proposed an evaluation, K.L. and K.L. described T.L. "as getting along with other children and adults, working very hard academically, loving school, having good self-esteem and having difficulty with focus at some times but not at other times."  *Id.* ¶ 9. Similarly, T.L. was described as "kind, caring, always respectful, having some friends, being very organized, turning in all homework, being extremely creative, being able to follow directions when given examples."  *Id.* ¶ 10.  T.L. also "volunteer[ed] answers in class when feeling confident and when encouraged, want[ed] to do well and to please, ha[d] moments of insecurity when reading, [gave] up at times, and ha[d] some behaviors immature for age."  *Id.* Further, "during structured whole group lessons [T.L.] tried to stay on task, but often became distracted . . . [and] would make noises, get up and down out of [the] seat, talk to neighbors and

turn head away from the instruction." *Id.* ¶ 11.  During the "unstructured times [T.L.] was improving the ability to start on a task immediately, but if [T.L.] had difficulty with the task, [T.L.] would give up and begin distracting behaviors.  *Id.*

On November 11, 2011, Lower Merion "prepared a Permission to Evaluate [PTE] form." *Id.* ¶ 12.  The letter was not postmarked until November, 28, 2011.  *Id.*  On December 1, 2011, K.L. and K.L. received the form and signed and returned it on December 6, 2011.  *Id.*  In the interim, K.L. (father) notified Defendant on November 14, 2011, that K.L. and K.L. elected to complete an independent evaluation of T.L., in addition to the evaluation Defendant was to conduct. *Id.* ¶ 13.   K.L. and K.L. sought a date for the private psychologist to go to T.L.'s school to observe T.L. at the school.  *Id.*  In Lower Merion's evaluation report, Lower Merion "found [T.L.] eligible for special education services under the primary classification of specific learning disability and the secondary classification of other health impairment due to Attention Deficit Hyperactivity Disorder [ADHD]."  *Id.* ¶ 25.  The evaluation report also "recommended a 'multisensory, sequential, rule based program of reading instruction[2] as [T.L.] is a bright youngster and concepts support memory for [T.L.].'"  *Id.* ¶ 27 (quoting P-2).  On February 10, 2012, Defendant met with K.L. and K.L. to discuss the evaluation report and K.L. and K.L. indicated that they agreed with the evaluation. *Id.* ¶ 26.

   2.  February 2012 IEP

On February 10, 2012, in addition to discussing Lower Merion's evaluation report, a team, including K.L. and K.L., met to create an Individualized Education Plan ("IEP") for T.L. (the "February 2012 IEP").  The February 2012 IEP contained the following:

   goals/objectives in handwriting related to copying text and to letter formation; goals/objectives in reading related to decoding [reading] and encoding [spelling]

---

[2] "'A multisensory, sequential, rule based program of reading instruction' is the way [Lower Merion] describes the Wilson reading program.'"  *Id.* ¶ 28 (quoting NT 758–760).

single and multisyllabic words, decoding letter sounds in nonsense words, acquiring high frequency sight words and oral reading fluency; and goals/objectives in math related to word problems with computation, money or time.

*Id.* ¶ 29.  Further, the February 2012 IEP included numerous Specifically Designed Instructions ("SDIs") to address T.L.'s difficulty with reading; math; attention, hyperactivity and organization; and handwriting.  *Id.* ¶¶ 30–33.  In particular, there were SDIs for, *inter alia*, "multisensory, systematic, rule-based program for reading and spelling; . . . provision of math tools; . . . preferential seating; visual of 'whole body cues' on desk and classroom wall; longer tasks divided into small parts; . . . provide incentives for attention and work completion with decreased prompting; [and] . . . extended time to complete assignments in writing."  *Id.* (quoting P-6).  Additionally, the February 2012 IEP "provided for Occupational Therapy for one 30-minute [individual] session weekly."  *Id.* ¶ 34.  The February 2012 IEP also called for the special education teacher and the regular education teacher to meet on a weekly basis for a consultation.

On February 10, 2012, Lower Merion also provided a Notice of Recommended Educational Placement ("NOREP") that "recommended, 'Itinerant Learning Support for Language Arts for 1 hour daily and Occupational Therapy 30 minutes weekly, direct.'"  *Id.* ¶ 36 (quoting P-14).  On the same day, K.L. and K.L. signed the NOREP thereby approving the February 2012 IEP.  *Id.* ¶ 37.  Nonetheless, K.L. and K.L. took T.L. to visit a private school (the "Private School") on February 29, 2012.  On the day of the visit, K.L. and K.L. contacted the school to request that Lower Merion send T.L.'s records to the Private School.

### 3. March 2012 IEP

During the spring parent-teacher conference on March 28, 2012, K.L. and K.L. spoke to Lower Merion about T.L.'s Extended School Year ("ESY") eligibility.  *Id.* ¶ 39.  In response to

the conversation, on March 30, 2012, an amendment was made to the February 2012 IEP to include ESY services (the "March 2012 IEP"). *Id.* The March 2012 IEP included a "summer 2012 ESY [which] was designed to address decoding and spelling single and multisyllabic words containing word patterns or families." *Id.* ¶ 40.  K.L. and K.L. approved the March 2012 IEP through a NOREP on March 30, 2012. *Id.* ¶ 42.  T.L.'s "recommended ESY program included services for the summer of 2012, specifically: 'Reading tutor for 45 minutes, 3x a week for 6 weeks; Hours between 8:00am to 3:30pm Monday through Friday; Location: to be determined mutually by the Parents and the tutor.'" *Id.* ¶ 42 (quoting P-7, P-15).

4.  June 2012 IEP

On June 12, 2012, Defendant held an IEP meeting with K.L. (mother), "the principal, the school counsel, the regular education teacher and the special education teacher" to develop a prospective IEP (the "June 2012 IEP"). *Id.* ¶ 43.  The June 2012 IEP "added two annual goals with corresponding objectives in math and an annual goal with corresponding objectives in written expression." *Id.* ¶ 44.   The June 2012 IEP also "added two [SDIs] to address math . . . [and] included updated present levels of educational functioning, and revised goals/objectives, [SDI] and educational placement [time spent outside the regular education setting]." *Id.* ¶ 45–46. Specifically, the June 2012 IEP

> proposed that [T.L.] receive special education instruction in the learning support classroom 1 hour daily for Language Arts and 1 hour daily for Math, and three 30-minute sessions of supplemental reading instruction for decoding and encoding weekly, as well as receiving one 30-minute occupational therapy session per week.

*Id.* ¶ 47.

5. <u>T.L.'s Progress as of June 2012</u>

In addition to the above-mentioned goals, "[t]he June [2012] IEP revision provided progress monitoring information for four instructional months, from the beginning of special education programming in February 2012 up to the end of the school year in June 2012." *Id.* ¶ 48.  Defendant found that "[a]s of June 2012, with one-year targets in the area of handwriting, moderate progress was noted after 4 instructional months in the areas of attention to details, independently spacing between words and orienting letters to the line." *Id.* ¶ 49.  Further,

> with one-year targets set at 80% accuracy for decoding and encoding, after 4 instructional months [T.L.] read and spelled CVC words with 100% accuracy, read CVCE words with 90% accuracy and spelled CVCE words with 80% accuracy, read CVVC words with 70% accuracy and spelled CVVC words with 40% accuracy, read CCVVC words with 50% accuracy and spelled CCVVC words with 30% accuracy, and read multisyllabic words with 40% accuracy.

*Id.* ¶ 50.  Defendant also observed that

> with one-year targets set at 80%-100% accuracy for sight words, after 4 instructional months [T.L.] progressed as follows: Primer list from baseline of **81%** in February to **94%** accuracy in June; First grade list from baseline of **85%** in February to **98%** accuracy in June; Second grade list from baseline of **70%** in February to **87%** accuracy in June; Third grade list from baseline of **68%** in February to **85%** accuracy in June.

*Id.* ¶ 51 (emphasis added).

Additionally, Defendant found that "with one-year targets set to increase oral fluency rate from 42 wpm to 90 wpm, although [T.L] . . . made some progress after 4 instructional months [T.L.] was inconsistent" and scored less than 67 on his last 8 probes of the school year.  *Id.* ¶ 52.  T.L. had "one-year math targets set at 80% . . . correctly solved, [and] after 4 instructional months [T.L.] maintained 90% on problems involving time or money, 100% on story problems requiring addition or subtraction and involving single digit computation."  *Id.* ¶ 53.  Nonetheless, "on the last three trials of the year [T.L.] scored 53% on addition/subtraction story problems and

on the last assessment involving four story problems with 2-digit numbers [T.L.] did not solve any correctly." *Id.* Moreover, Defendant found that T.L.'s "behavior issues were being successful managed within the regular education classroom." *Id.* ¶ 55. T.L.'s "teacher, who was a long-term substitute when [T.L.] was in 1st grade observed an improved temperament in 2nd grade as compared to 1st grade." *Id.* T.L.'s report card also "indicate[d] that Social Skills . . . ratings improved overall from 1st grade." *Id.* ¶ 56.

Though Defendant found that T.L. progressed in numerous areas, at the IEP meeting K.L. (mother) "shared that [T.L.] was frustrated during homework." *Id.* ¶ 57. In response, Defendant informed K.L. (mother) of "its homework policy, specifically that [T.L.] could stop homework if it took over 30 minutes to complete and that [K.L. and K.L.] should contact the teacher when that happens so that modifications could be made." *Id.* K.L. (mother) also argued that the science and social studies classes provided by Defendant "were not geared towards learning disabled students." *Id.* ¶ 58. The principal disagreed with K.L.'s contention and attempted to "explain[] differentiated instruction." *Id.* Additionally, K.L. (mother) questioned "why supplemental reading [additional reading three times a week] that was being offered in the June 2012 IEP was not offered in the February 2012 IEP." *Id.* ¶ 59. In response, Defendant "explained that an IEP beings with the least restrictive environment, but that although [T.L.] was making progress under the February 2012 IEP [T.L.] was at a critical stage for acquiring decoding skills and therefore additional reading was being proposed for 3rd grade." *Id.*

At the IEP Meeting, Defendant also "proposed keeping [T.L.] in the regular education setting for subjects related to language arts and math, and having [T.L.] miss social studies and science on a rotating basis" in order for Defendant "to provide additional pull-out special education services" for T.L. *Id.* ¶ 60. K.L. (mother) rejected this proposal. *Id.* In response,

Defendant suggested T.L. miss a foreign language instead.  *Id.*  K.L. (mother) also rejected this proposal.  *Id.*

On June 12, 2012, K.L. and K.L. rejected the June 2012 IEP.  At this time K.L. and K.L. informed Defendant that they would be enrolling T.L. in the Private School and would seek reimbursement for educational expenses related to this enrollment.  *Id.* ¶ 61.  The parents explained that they made this decision because "'[t]he IEP [was] not achieving the appropriate educational goals. . . . [and] [T.L.] [was] becoming increasingly frustrated as a result of [T.L.'s] learning disability.'"  *Id.* ¶ 63 (quoting NT 63, 830–31; P-52).  Further, the June 2012 IEP "creat[ed] a reduced interest in learning and a slowing of progress.'"  *Id.* (quoting NT 63, 830–31; P-52).  K.L. and K.L. "also rejected the offered ESY program, according to the mother, because of the difficulty of transporting [T.L.] to and from the tutoring sessions at the times of day proposed."  *Id.* ¶ 64.  K.L. and K.L. did not, however, raise their concerns regarding transportation for the ESY program during the June 2012 IEP meeting.  *Id.* ¶ 65.

### F.  *Summer 2012*

In the summer of 2012, K.L. and K.L. enrolled T.L. at the Private School for its summer program.

### G.  *2012-2013 Academic Year*

In the fall of 2012, T.L. began third grade at the Private School. On or about March 21, 2013, K.L. and K.L.'s counsel contacted Defendant to inquire about the ESY services available for T.L. in the summer of 2013 and the school placement available for T.L. during the 2013-2014 school year.  *Id.* ¶ 73.  On April 8, 2013, Defendant issued a NOREP offering T.L. Summer 2013 ESY programming.  Instead of accepting or rejecting the NOREP, K.L. and K.L. requested an IEP meeting on April 16, 2013.

1.  <u>May 2013 IEP Meeting</u>

On May 14, 2013, Defendant held an IEP meeting with K.L. (mother), K.L. (father), "the

principal, the director of special education, the speech/language pathologist, the occupational

therapist, a special education teacher, a regular education teacher, and attorneys for both

[Defendant] and [Plaintiffs]."  *Id.* ¶ 75.  The parties agreed to "a re-evaluation for

speech/language eligibility and a functional behavior assessment, both to be completed before

the start of the 2013-2014 school year."  *Id.* ¶ 76.  During the meeting, K.L. and K.L.

> expressed concerns about [T.L.] as follows: anxiety when completing homework
> assignments, anxiety around writing assignments, needs in executive functioning
> skills, the need for psychological counseling to address anxieties surrounding
> school, their belief that [T.L.'s] anxiety affects ability to access the educational
> curriculum without 1 to 1 teaching and a small group environment, ADHD affects
> ability to access the curriculum, the need for [T.L.] to continue with the Wilson
> reading program, their desire that [T.L.'s] teachers are trained in language deficits
> to address literacy needs.

*Id.* ¶ 78.

On May 21, 2013, as a follow up to the May 14, 2013 IEP meeting, K.L. and K.L.

emailed Defendant to "reiterate[e] concerns about anxiety, homework, executive functioning,

small setting, and [a] language enriched program."  *Id.* ¶ 79.  K.L. and K.L. also expressed

"concerns about concentration and attention deficits requiring prompting during tests and other

work, [and] frustration related to performing tasks."  *Id.*  Further, K.L. and K.L. were concerned

about the "'need to provide an educational setting in a regular classroom that will not cause

[T.L.] to be socially persecuted and/or singled out as different' and 'the need to provide

integrated art-based learning to provide a true multi-sensory educational environment', and need

to address 'encoding and spelling' skills."  *Id.* (quoting P-9).

2.  <u>May 2013 IEP</u>

Prior to the conclusion of the May 14, 2013 IEP meeting, Defendant "issued a draft proposed IEP that contained the results of its February 2012 evaluation and the results of the November/December 2011 private evaluation, present levels of education performance provided by the [P]rivate [S]chool, and results of an occupational therapy evaluation completed in August 2012 at the [P]rivate [S]chool" (the "May 2013 IEP"). *Id.* ¶ 77.  The May 2013 IEP:

> carried goals/objectives in reading related to decoding [reading] and encoding [spelling] single and multisyllabic words containing word patterns in families in isolation or in context, to reading comprehension by identifying evidence in an instructional reading level text to draw inferences, to reading fluency on a third grade level passage; goals/objectives in written expression related to developing strategies to organize thoughts and combine with background knowledge and opinions to write an essay, to score a three on the Pennsylvania writing rubric assessing focus, content, organization, style and conventions; and goals/objectives in math related to accurate problem-solving; and goals/objectives related to using self-regulation strategies to participate in school tasks independently for 15-20 minutes.

*Id.* ¶ 80.

The May 2013 IEP included multiple SDIs from previous IEPs to address T.L.'s difficulty with reading; math; attention, hyperactivity and organization; and handwriting.  *Id.* ¶¶ 81–84.  The May 2013 IEP also added the following SDIs to address T.L.'s attention, hyperactivity, and organization: "modifying tests, chunking questions, and providing word banks; providing redirection and frequent authentic positive reinforcement to increase attention for listening activities; reduce environmental distractions including closing windows and doors when noises interfere with listening."  *Id.* ¶ 81.  The May 2013 IEP added an SDI to "introduce[e] new curricular vocabulary words individually prior to presenting them in class" to address T.L.'s reading difficulties.  *Id.* ¶ 82.  Further, the May 2013 IEP added an SDI to

"encourage use of a pencil grip to decrease pressure and fatigue" to address T.L.'s handwriting difficulties. *Id.* ¶ 84.

The May 2013 IEP also added SDIs to address written expression and anxiety. *Id.* ¶¶ 85–86. The May 2013 IEP "provided for Occupational Therapy for one 30-minute [individual] pull out session weekly for the first trimester and then push-in support in the classroom for 30 minutes per week." *Id.* ¶ 87. The May 2013 IEP also called for the special education teacher and the regular education teacher to meet on a daily basis for a consultation and a "review of SDI by the occupational therapist followed by consultation with teachers to assist with supports and implementation." *Id.* ¶ 88. Under the May 2013 IEP, T.L.

> would receive special education services in Math in the resource room for 1 hour per day, five days per week; Language Arts in the learning support room for 1 hour and 40 minutes per day, five days per week; Supplemental Reading in the learning support room for 45 minutes per day, [five] days per week. . . . [Additionally T.L.] would be with [T.L.'s] nondisabled peers to receive Science/Social Studies in the regular education room with adult support for 45 minutes per day, five days per week; Special Areas . . . ; Lunch for 30 minutes daily; Recess for 20 minutes daily.

*Id.* ¶¶ 89–90.

Moreover, under the May 2013 IEP, Defendant "proposed an ESY program consisting of [individual] tutoring in reading four times a week for 45-minutes each session for eight weeks, [individual] writing tutoring three times a week for 30-minutes each session for eight weeks." *Id.* ¶ 91. Additionally, the May 2013 IEP "provided for ESY instruction in reading, writing, and mathematics in the learning support classroom environment three days per week, 4 hours per day from June 25, 2013 through August 1, 2013." *Id.* The May 2013 IEP included transportation to and from the designated building for T.L.'s "ESY programming in the learning support classroom." *Id.* ¶ 92.

Ultimately, K.L. and K.L. rejected the May 2013 IEP, including the ESY program. *Id.* ¶ 94.

### H.  Summer 2013

In the summer of 2013, K.L. and K.L. enrolled T.L. at the Private School for its summer program.

### I.  2013-2014 Academic Year

#### 1.  August 2013 Re-Evaluation Report

Following the May 14, 2013 IEP Meeting, Lower Merion "requested, and [K.L. and K.L.] provided, permission to re-evaluate [T.L.], and [Lower Merion] conducted a re-evaluation in late spring and early summer 2013."  *Id.* ¶ 96.  On August 23, 2013, approximately fourteen months after T.L. began school at the Private School, Defendant issued its re-evaluation report (the "August 2013 Re-Evaluation Report").  *Id.* ¶ 97.  The August 2013 Re-Evaluation Report "indicated that [T.L.] was below grade level expectations on writing, reading and some aspects of math." *Id.* ¶ 98.  Specifically, T.L. experienced "difficulty regulating emotions throughout each school day, difficulty with math tests and new concepts, and that paragraph writing tasks trigger[ed] whimpering, crying, and noises." *Id.* ¶ 99.  Additionally, T.L. "did not socialize with many students at [the Private School], however [T.L.] did like to be physically close to certain students hugging or poking them at times." *Id.* ¶ 100.  Two of T.L.'s teachers at the Private School completed a behavior assessment and the teachers' responses indicated "Clinically Significant concerns on the School Problems, Internalizing Problems, Adaptive Skills, and Behavior Symptom Index scales." *Id.* ¶ 101.

The August 2013 Re-Evaluation Report also included results from a functional behavioral assessment (the "FBA") conducted on August 13, 2013.  *Id.* ¶ 102.  T.L.'s Private

School "teacher's input into the FBA indicated that [T.L.'s] classwork completion percentage is approximately 20% while classwork accuracy is 90%." *Id.* ¶ 103.  The results were likely "related to withdrawing, shutting down, inattention and impulsivity predominantly during writing, math and Wilson reading." *Id.*  The FBA also "noted that [T.L.'s] noncompliance/withdrawal was difficult to manage and very disruptive to the classroom, that these behaviors are displayed approximately 10-12 times each class period and that they have been present the entire school year." *Id.* ¶ 104.  Further, the FBA indicated that T.L.'s "hyperactivity was difficult to manage and very disruptive to the classroom environment, displayed 7-9 times per class period and were present the entire school year." *Id.* ¶ 106.

In addition to the preceding assessments, the August 2013 Re-Evaluation Report included a description of T.L.'s behaviors from K.L. and K.L. and a Speech/Language Evaluation. *Id.* ¶ 107–108.  T.L. was found to be ineligible for speech and language services. *Id.* ¶ 108.  According to the August 2013 Re-Evaluation Report, T.L. had the following needs: "basic reading, reading fluency, and reading comprehension; math calculation and math problem solving; written expression; time on task; task completion; affect regulation; written productivity; in pencil pressure and control; and use of learned self-regulation strategies in classroom." *Id.* ¶ 109.

In August 2013, Defendant, K.L. and K.L. met informally to discuss programming for T.L. *Id.* ¶ 110.  After this meeting, K.L. and K.L. placed Defendant "on notice that they were unilaterally placing [T.L.] back at the [P]rivate [S]chool for 4th grade [2013-2014] and would be seeking reimbursement for their expenses." *Id.*  In response, Defendant wrote a letter indicating that it would provide T.L. programming in the future if K.L. and K.L. were to consent to such

programming and that it would not reimburse K.L. and K.L. for T.L.'s tuition expenses. *Id.* ¶ 111.

### 2. September 2013 IEP

On September 3, 2013, K.L., K.L., the case manager, the director of special education, the principal, the school psychologist, the speech/language pathologist, the occupational therapist, and the regular education teacher attended an IEP meeting "to discuss the August 2013 re-evaluation and potential programming to revise the May 14, 2013 IEP." *Id.* ¶¶ 112–13. At the meeting, the parties were able to develop an IEP (the "September 2013 IEP") that "carried all the goals/objectives in reading decoding, reading encoding, reading comprehension, reading fluency, written expression and mathematics that were presented in the May 14, 2013 IEP." *Id.* ¶ 114. The September 2013 IEP also added two new goals/objectives, including: "for math, a related to regrouping addition and subtraction; for anxiety, utilizing a calming strategy such as deep breathing, visualizing, and requesting a break; for task completion, beginning a task within one minute and remaining [on] task for 10 minutes [modified the related SDI from May 14, 2013 IEP]." *Id.* Further, the September 2013 IEP included SDIs to address T.L.'s difficulty with attention, hyperactivity and organization; reading; math; handwriting; written expression; anxiety; behavior and social/emotional difficulties; and organization and time management. *Id.* ¶¶ 115–122. In particular, there were SDIs for, *inter alia*,

> allowing breaks and opportunities to be active in the classroom, preferential seating; . . . repeating directions given to whole class or have [T.L.] restate directions; . . . modifying tests, chunking questions, and providing word banks; . . . multisensory, systematic, rule-based program for reading and spelling; . . . multisensory practice to review sight words; . . . provision of visual to aid in learning key words and having [T.L.] highlight key words in math problems; . . . encouragement regarding stabilizing paper when writing; allowing dictation of written work when frustrated; extended time to complete assignments in writing; . . . continue with occupational therapy through push-in support to encourage generalization of strategies to increase written production and self-regulation; . . .

> graphic organizers for writing assignments; . . . provision of alternate ways to showcase knowledge; additional adult support; encourage relaxation and self-regulation strategies in the classroom; . . . encourage to actively seek help/support when needed; provision of alternate assignments if [T.L.] seems anxious or overwhelmed by an assignment; . . . social scripts, visual card to remind of expected behavior; access to school counselor to address social/emotional difficulties; use preferred activities such as art and music as motivators; . . . help in maintaining a daily homework assignment book; help in establishing a before-class routine; [and] chunking tasks and avoid providing large multi-step verbal directions.

*Id.*

The September 2013 IEP "provided for Occupational Therapy for one 30-minute [individual] direct pull out session weekly for the first trimester and then push-in support in the classroom for 30 minutes per week to assist in skill generalization." *Id.* ¶ 123. The September 2013 IEP also called "for the case manager to support the regular education teacher and special areas teachers with resource material across the school day, and supply these teachers with copies of the SDI and assist in implementation and monitoring of SDI." *Id.* ¶ 124. Further, the September 2013 IEP called for a "review of SDI and IEP by the occupational therapist with staff to assist with supports and implementation." *Id.* ¶ 125. Under the September 2013 IEP, T.L.

> would receive special education services in Math in the resource room for 1 hour per day, five days per week; Language Arts in the learning support room for 1 hour and 40 minutes per day, five days per week; Supplemental Reading for 45 minutes per day, [five] days per week. . . . [Additionally T.L.] would be with [T.L.'s] nondisabled peers to receive Science/Social Studies in the regular education room with adult support for 45 minutes per day, five days per week; Special Areas . . . ; Lunch for 30 minutes daily; Recess for 20 minutes daily.

*Id.* ¶¶ 126–27. The September 2013 IEP "did not propose an updated ESY program for summer 2014 as the dates reflected 2013 programming." *Id.* ¶ 128.

On September 11, 2013, Defendant received "[a]n additional fifteen pages of additional information . . . [from] the [P]rivate [S]chool." *Id.* ¶ 239. Upon receipt of the additional

16

information, Defendant created a positive behavior support plan ("PBSP") that "outlined

appropriate goals, antecedent strategies, replacement behaviors, and consequences."  *Id.* ¶¶ 129–

30.

### 3.   November 2013 Re-Evaluation Report

On September 10, 2013, Defendant "requested that [K.L. and K.L.] permit an additional

re-evaluation to determine whether [T.L.'s] learning issues could be based in autism."  *Id.* ¶ 131.

On November 14, 2013, Defendant completed a report regarding its re-evaluation of T.L. (the

"November 2013 Re-Evaluation Report") and presented it to K.L. and K.L. the following day.

*Id.* ¶ 133. The November 2013 Re-Evaluation Report "included the Autism Spectrum Rating

Scales [ASRS] completed by the parents and three [P]rivate [S]chool teachers."  *Id.* ¶ 134.  The

November 2013 Re-Evaluation Report also "included input from [T.L.'s] therapist who noted

that she does not believe that [T.L.] [presents] with an Autism Spectrum Disorder . . . [r]ather she

posited that anxiety and ADHD continued to interfere with learning and socialization."  *Id.* ¶

136.  The November 2013 Re-Evaluation Report ultimately concluded that "at this time [T.L.]

does not present as a child with an Autism Spectrum Disorder. . . . it appears that difficulties with

learning, attention regulation and anxiety are the primary factors impacting social and behavioral

functioning."  *Id.* ¶ 138.

### 4.   December 2013 IEP

On December 4, 2013, K.L., K.L., the director of special education, the speech/language

pathologist, the occupational therapist, the special education teacher, and the regular education

teacher attended an IEP meeting to discuss the November 2013 Re-Evaluation Report and to

develop a new IEP (the "December 2013 IEP").  *Id.* ¶¶ 139–40.  The December 2013 IEP

included input from T.L.'s therapist and T.L.'s fourth grade teacher at the Private School.  *Id.* ¶¶

141–42.  The December 2013 IEP "carried all the goals/objectives related to reading decoding, reading encoding, reading comprehension, reading fluency, written expression, mathematics and anxiety that were presented in the September 3, 2013 IEP."  *Id.* ¶ 143.  Additionally, the December 2013 IEP "carried all the SDIs contained in the September 3, 2013 IEP related to the areas of reading/spelling, written expression, math, handwriting, attention, anxiety, behavior/social/emotional and organization."  *Id.* ¶ 144.  The December 2013 IEP also added the following SDIs:

> Direct counseling to target social skills; affect regulation, flexibility and anxiety [30 minutes per day]; use of nonverbal gestures rather than frequent verbal prompts to prevent reliance on these cues and avoid embarrassment; provide frequent "check ins" by an adult and provide the "just right" amount of input to keep [T.L.'s] attention without overloading; adjust task demands through gradual complexity [and/or] mix preferred with nonpreferred tasks based on [T.L.'s] self-perception of ability level.

*Id.* ¶ 145 (quoting P-11).

Further, the December 2013 IEP "proposed one 30-minute OT session provided as a push-in into the classroom."  *Id.* ¶ 146.  The case manager and occupational therapist would continue to support the teachers and staff.  *Id.* ¶ 147.  Under the December 2013 IEP, Defendant proposed to place T.L. in a "Supplemental Learning Support program in the neighborhood school."  *Id.* ¶ 148.  This program included: "Learning Support Room . . . Math instruction, 1 hour a day, 5 days a week; Language Arts, 1 hour and 40 minutes a day, 5 days a week; Writing, 30 minutes a day, 5 days a week; Supplemental Reading, 45 minutes a day, 5 days a week."  *Id.* T.L. would receive reading instruction "through the Wilson Reading Program, referenced in each proposed IEP as a 'multisensory, sequential, rule based program of reading instruction.'"  *Id.* ¶ 149.  Additionally, T.L.'s "summer reading tutoring for ESY would be provided by a Wilson certified teacher as well."  *Id.* ¶ 150. T.L. would also "be educated in the Regular Education

Classroom in the neighborhood school with nondisabled peers with adult support for Science and

Social Studies, 45 minutes a day, 5 days a week and in Special Area Instruction with adult

support." *Id.* ¶ 154.  T.L. would receive additional support in the regular education setting as

well, such as: "scaffolding to break down information, pacing of instruction, differentiated

instruction, and previewing and pre-teaching material." *Id.* ¶ 153.  The December 2013 IEP also

provided for ESY programming in the summer of 2014.   The ESY programming would include

"tutoring in reading and writing as well as classroom instruction in  reading, writing, and

mathematics." *Id.* ¶ 155–56.  Defendant would provide transportation for the classroom

component of the ESY programming.  *Id.* ¶ 156.

On December 12, 2013, K.L. and K.L. rejected the December 2013 IEP.  *Id.* ¶ 158.

### J.   Summer 2014

In the summer of 2014, T.L. "received private tutoring in the Wilson reading program."

*Id.* ¶ 159.

### K.   2014-2015 Academic Year

In the fall of 2014, T.L. began fifth grade at the Private School.  *Id.* ¶ 161.

## II.   PROCEDURAL HISTORY

On June 27, 2014, K.L. and K.L. filed a Due Process Complaint and sought

reimbursement for T.L.'s educational expenses.  *Id.* ¶ 162.  On dates in August, September, and

October, the Hearing Officer held due process hearings.  On November 26, 2014, the Hearing

Officer rendered her decision denying all of Plaintiffs' claims.  The Hearing Officer found, *inter*

*alia*, that

> [g]iven the chronology of events starting with the timing of the private evaluation,
> [T.L.'s] visit to the [P]rivate [S]chool, [K.L. and K.L.'s] request for [Defendant]
> to provide the [P]rivate [S]chool with records and the removal of [T.L.] from
> [Lower Merion] after only four months of IEP implementation, the evidence

unequivocally supports the finding that [K.L. and K.L.] placed [T.L.] in the [P]rivate [S]chool not because they disagreed with the special education program [Defendant] offered, but because they were convinced that the [P]rivate [S]chool would offer [T.L.] a better program.

HOD at 27–28.  Furthermore, the Hearing Officer concluded that "[i]n this case, each of [Defendant's] IEPs [were] appropriate. . . . [Defendant] offered [T.L.] a free appropriate public education [FAPE] representing considerably more than the basic floor of opportunity the law affords, both for the academic years as well as for Extended School Year."  *Id.* at 28.

On February 20, 2015, Plaintiffs filed the Complaint against Defendant in this Court. Doc. 1.  In Count I, Plaintiffs allege that Defendant violated the Individuals with Disabilities Education Act (the "IDEA") by failing to provide T.L. with a free appropriate public education. *Id.* at 9–15.  In Count II, Plaintiffs allege that Defendant violated § 504 of the Rehabilitation Act by failing to provide T.L. with a free appropriate public education.  *Id.* at 15–21.

On July 30, 2015, Plaintiffs filed the instant Motion for Judgment on the Administrative Record.  Doc. 12.  Plaintiffs seek reimbursement of the following:

(1). All tuition and fees they paid to [the Private School] for T.L.'s education during the 2012-2013, 2013-2014, and 2014-2015 school years;

(2). All tuition and fees they paid to [the Private School] for T.L.'s Extended School Year program during the Summer of 2012 and the Summer of 2013;

(3). All tuition and fees they paid for T.L.'s Extended Year program during the Summer of 2014; and

(4). All transportation costs expended in order to transport T.L. to [the Private School] during the Summer of 2012 and during the Summer of 2013.

*Id.* at 1–2.

### III.    JURISDICTION

This Court has jurisdiction over Plaintiffs' action pursuant to 20 U.S.C. § 1415(i)(2)(A). Section 1415(i)(2)(A) provides that

> [a]ny party aggrieved by the findings and decision made under subsection (f) or
> (k) who does not have the right to an appeal under subsection (g), and any party
> aggrieved by the findings and decision made under this subsection, shall have the
> right to bring a civil action with respect to the complaint presented pursuant to
> this section, which action may be brought in any State court of competent
> jurisdiction or in a district court of the United States, without regard to the amount
> in controversy.

20 U.S.C. § 1415(i)(2)(A); *see also G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608

(3d Cir. 2015) (explaining that "[a] party dissatisfied with the result of [the administrative]

hearing may then file an action in state or federal court").  Furthermore, district courts "have

original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States."  28 U.S.C. § 1331.

## IV.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but

early enough not to delay trial—a party may move for judgment on the pleadings."  A court will

"grant the motion only if, viewing all the facts in the light most favorable to the nonmoving

party, no material issue of fact remains and the moving party is entitled to judgment as a matter

of law."  *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 257 (3d Cir. 2012).  Accordingly, "only the

factual allegations contained in the pleadings in this action, as well as certain documents

'integral to or explicitly relied upon in the complaint,' may be considered."  *Citizens Ins. Co. of

Am. v. Selective Way Ins. Co.*, 98 F. Supp. 3d 782, 787 (E.D. Pa. 2015) (quoting *U.S. Express

Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)).  District courts "must 'accept as true

allegations in the complaint and all reasonable inferences that can be drawn therefrom.'"

*Williams v. Allstate Ins. Co.*, 595 F. Supp. 2d 532, 537 (E.D. Pa. 2009) (quoting *Rocks v. City of

Phila.*, 868 F.2d 644, 645 (3d Cir. 1989)).  Courts "will not, however, accept unsupported

conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations." *Id.* (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).

In reviewing Plaintiffs' claim pursuant to the IDEA, this Court must "apply a nontraditional standard of review." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 241 (3d Cir. 2009). Specifically, while the district court "'must make its own findings by a preponderance of the evidence . . . [it] must also afford due weight to the ALJ's determination.'" *Id.* (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)); *see also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (explaining that "a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate"). Accordingly, "[t]he 'due weight' standard requires the court to consider the '[f]actual findings from the administrative proceedings ... prima facie correct' and, if the court fails to adopt those findings, it must explain its reasons for departing from them." *Mary T.*, 575 F.3d at 241 (quoting *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199). Additionally, the district court "must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199 (quoting *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995)). Moreover, this Court is mindful that it must not "substitute its own notions of sound educational policy for those of local school authorities.'" *Ridley Sch. Distr. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (quoting *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)).

## V.     DISCUSSION

### A.  IDEA

One of the purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  Accordingly, "[t]he IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide."  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).  A local education agency ("LEA") that is eligible for federal financial assistance pursuant to the IDEA—like Lower Merion—, is required to "establish and maintain procedures . . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education."  20 U.S.C. § 1415(a).  Further, "[t]he IDEA contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an . . . [IEP] . . . the 'centerpiece' of the IDEA's system for delivering education to disabled children."  *D.S.*, 602 F.3d at 557 (quoting *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 173 (3d Cir. 1988)).  If, however, "parents believe that the school district is not providing a FAPE for their child, they may unilaterally remove him from the school, enroll him in a different school, and seek tuition reimbursement for the cost of the alternative placement."  *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013); *Mary T.*, 575 F.3d at 242.  Thus, while

23

> Congress has imposed a significant financial burden on States and school districts that participate in IDEA. . . . public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice.

*Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993).

If a parent does elect to unilaterally remove the child from the school, a district court "may grant the family tuition reimbursement only if it finds that the school district failed to provide a FAPE and that the alternative private placement was appropriate." *Munir*, 723 F.3d at 426; *see also Carter*, 510 U.S. at 15. Additionally, "[e]ven where a District is found to be in violation of the IDEA and private school placement is deemed appropriate, 'courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant.'" *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 71 (3d Cir. 2010) (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009)). Nevertheless, "[p]arents who change their child's placement without the consent of state or local officials, however, "do so at their own financial risk." *Munir*, 723 F.3d at 426 (quoting *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985)).

In the present case, "[a]s the party seeking relief and the party challenging the administrative decisions, Plaintiffs bear the burden of persuasion on their IDEA . . . claim[]." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012). Under the first prong of an IDEA action, Plaintiffs must demonstrate that Defendant did not provide a FAPE. *Carter*, 510 U.S. at 15; *Munir*, 723 F.3d at 426. Plaintiffs contend that "[t]he testimony and evidence of record make it abundantly clear that Lower Merion did not provide T.L. with an appropriate placement when he left the District in June of 2012, and that every IEP proposed since that time was inappropriate to address his documented educational challenges." Mot. for Judgment at 11, Doc. 12. In

contrast, Defendant maintains that although it provided a FAPE, K.L. and K.L. elected to enroll T.L. in the Private School, thus Plaintiffs are unable to recover under the IDEA.  Def. Resp. at 31, Doc. 13.  Accordingly, this Court will first determine whether Defendant provided Plaintiffs a FAPE in accordance with the IDEA.

The IDEA defines a FAPE as:

> special education and related services that–(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  Thus, "[a] FAPE 'consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'"  *Ridley Sch. Distr.*, 680 F.3d at 268–69 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89 (1982) (internal quotation marks omitted)).  The IDEA "leaves the responsibility of providing a free appropriate public education to students with disabilities to state and local educational authorities."  *W.H. v. Schuykill Valley Sch. Dist.*, 954 F. Supp. 2d 315, 323 (E.D. Pa. 2013).  Despite this responsibility, "[s]chool-districts are not . . .  required to 'maximize the potential' of each handicapped student."  *Munir*, 723 F.3d at 426 (quoting *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)).  Rather, school districts "must supply an education that provides 'significant learning' and 'meaningful benefit' to the child."  *Ridley Sch. Distr.*, 680 F.3d at 269 (quoting *D.S.*, 602 F.3d at 556).  Moreover, "'[t]he provision of merely more than a trivial educational benefit' is insufficient."  *Id.* (quoting *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)).

In assessing Plaintiffs' challenge to Defendant's provision of a FAPE, this Court "must (1) consider whether the school district complied with IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'" *Mary T.*, 575 F.3d at 249 (quoting *Rowley*, 458 U.S. at 206–07). In order to comply with the IDEA, "school districts . . . [must] develop an IEP for each child with a disability . . . with parents playing 'a significant role' in this process." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007) (quoting *Schaffer v. Weast,* 546 U.S. 49, 53 (2005)). The IDEA defines an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [20 U.S.C. § 1414(d)]." 20 U.S.C. § 1414(d)(1)(A)(i). When developing an IEP, the IEP team[3] must consider: "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." 20 U.S.C. § 1414(d)(3)(A). Further, the IEP must "consist[]of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services.'" *D.S.*, 602 F.3d at 557.

The IDEA requires school districts to ensure that an IEP Team:

---

[3] An IEP Team consists of the following individuals:

(i) the parents of a child with a disability; (ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment); (iii) not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child; (iv) a representative of the local educational agency . . .; (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi); (vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and (vii) whenever appropriate, the child with a disability.

20 U.S.C. § 1414(d)(1)(B).

(i) reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved; and
(ii) revises the IEP as appropriate to address--
> (I) any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate;
> (II) the results of any reevaluation conducted under this section;
> (III) information about the child provided to, or by, the parents, as described in subsection (c)(1)(B);
> (IV) the child's anticipated needs; or
> (V) other matters.

20 U.S.C. § 1414(d)(4)(A).  Accordingly, "'[a]t a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'"  *Ridley Sch. Distr.*, 680 F.3d at 269 (quoting *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009)).  Additionally, the IEP must assist the child in receiving meaningful educational benefits in light of the student's "'individual abilities.'"  *Id.* (quoting *Ridgewood Bd. of Educ.*, 172 F.3d at 248).  Further, "the IEP must provide the student with a 'basic floor of opportunity.'"  *Id.* (quoting *D.S.*, 602 F.3d at 557).  The IEP is not, however, required "to provide 'the optimal level of services,' or incorporate every program requested by the child's parents."  *Id.* (quoting *D.S.*, 602 F.3d at 557).  The "parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student."  *W.H.*, 954 F. Supp. 2d at 324.  In assessing "the measure and adequacy of an IEP" the Court must examine its adequacy "as of the time it is offered to the student, and not at some later date."  *Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993).

Plaintiffs raise the following grounds upon which they contend support their argument that Defendant failed to provide a FAPE: (1) Defendant did not provide appropriate behavioral programming, (2) Defendant did not provide appropriate remedial support, and (3) Defendant's

ESY programming was inappropriate.  Mot. for Judgment at 11–23.  The Court will address each in turn.

1. Behavioral Programming

First, Plaintiffs argue that none of the IEPs provided appropriate behavioral programming.  In particular, Plaintiffs allege that "[e]ach of the IEPs Lower Merion generated between February 2012 and December of 2013 specifically asked whether T.L. exhibited behaviors that impeded his learning, or the learning of his classmates."  Mot. for Judgment at 13.  However, none of the IEPs answered the question in the affirmative and if they had done so, "T.L. should have undergone a Functional Behavioral Assessment which would then have been used to create a Positive Behavior Support Plan."  *Id.*  Defendant did not offer "an IEP containing a Positive Behavioral Support Plan until December of 2013."  *Id.* at 15.  Even then, Defendant "failed to program appropriately to deal with these challenges thereby making its proposed December 2013 IEP inappropriate to this very day."  *Id.*  Plaintiffs maintain that T.L. still exhibits "executive functioning challenges, attention issues, and experienced anxiety."  *Id.* In contrast, Defendant contends that all of the IEPs provided to Plaintiffs were appropriate.

The IDEA requires the IEP Team, "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i).  Some courts have held that "[w]hile an FBA may be appropriate as a matter of good practice in some instances where a student shows behavioral problems, 'the IDEA only requires such analysis where a [student] has been identified with a disability and has an IEP in place, yet still displays behavioral problems.'"  *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 565 (E.D. Pa. 2013) (quoting *D.K. v. Abington Sch. Dist.*, Civil Action No. 08–cv–4914,

2010 WL 1223596, at *9 (E.D. Pa. Mar. 25, 2010)).   Other courts have held that, "[t]he IDEA

has . . . been held to impose an affirmative requirement to conduct an FBA, though that

obligation only arises in situations where a 'disabled student is subjected to certain types of

discipline.'"  *Id.* (quoting *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist.*, 375

F.3d 603, 614 (7th Cir. 2004)).  Nonetheless, "[o]ther courts . . . have held that an FBA is not

required where 'the IEP sets forth other means to address the student's problematic

behaviors.'"  *Jalen Z. v. Sch. Dist. of Phila.*, 104 F. Supp. 3d 660, 670 (E.D. Pa. 2015) (quoting

*M.H. v. N.Y. City Dep't of Educ.*, 712 F. Supp. 2d 125, 158 (S.D.N.Y. 2010)).  Similarly, "[t]he

IDEA does not require that the District go beyond identifying needs and goals related to behavior

(i.e., to create a separate behavior intervention plan)."  *Robert B. ex rel. Bruce B. v. W. Chester

Area Sch. Dist.*, Civ. A. 04-CV-2069, 2005 WL 2396968, at *7 (E.D. Pa. Sept. 27, 2005).

        In *A.C. ex rel. M.C. v. Board of Education of the Chappaqua Central School District*, the

plaintiffs brought an IDEA claim against the defendant school district for tuition reimbursement.

553 F.3d 165, 168 (2d Cir. 2009).  The plaintiffs argued that "Chappaqua failed to offer a free

appropriate public education by, among other things, not providing for a functional behavioral

assessment ('FBA') of M.C."  *A.C.*, 553 F.3d at 169.  The district court held that "Chappaqua's

failure to conduct an FBA was a procedural violation of the IDEA that denied M.C. a free

appropriate public education."  *Id.* at 170.  The Second Circuit disagreed.  *Id.* at 172.  The

Second Circuit explained that "[t]he IDEA requires that, in developing an IEP for 'a child whose

behavior impedes the child's learning,' the school district must 'consider the use of positive

behavioral interventions and supports, and other strategies, to address that behavior.'"  *Id.*

(quoting 20 U.S.C. § 1414(d)(3)(B)(i)).  The Second Circuit found that, "Chappaqua satisfied

this requirement, and its decision not to also conduct an FBA did not rise to the level of denying

M.C. a free appropriate public education." *Id.*  The Second Circuit concluded that "[t]he preponderance of the evidence supports the SRO's decision that the IEP adequately addressed M.C.'s behavior, and the sufficiency of Chappaqua's strategies for dealing with this behavior 'is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.'" *Id.* at 172–73 (quoting *Grim v. Rhineback Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003)).

The initial evaluation report of T.L. in February 2012 stated that T.L. "is easily distracted and often distracts [T.L.'s own self]."  Admin. Record, Exh. 8 at P-2 pg. 12, Doc. 7.   Further, in the "Summary of Findings/Interpretation of Evaluation Results" section of the initial evaluation report, it stated that "T.L. is a friendly and cooperative youngster who needs a high frequency of teacher support and encouragement to focus and to complete tasks." *Id.*  In light of these behaviors, Plaintiffs' counsel questioned Defendant's school psychologist, Dr. Adil Nure, as to why an FBA was not completed and a positive behavior support plan not developed.  Admin. Record, Exh. 6 at 58.  Dr. Nure responded by explaining that "just having a diagnosis of ADHD alone doesn't necessarily mean a child needs an FBA or a positive behavior support plan." *Id.* Rather, "[t]here are many students with ADHD who respond to the SDIs that can be provided in a special education classroom." *Id.*  In fact, in 2012 despite not having an FBA or formal positive behavior support plan, T.L.'s second grade teacher, Ms. Discepola, testified that she "had a positive behavior support plan in [her] classroom with [T.L.], and . . . [was] managing [T.L.'s] behaviors within the classroom." *Id.* at 76.  For example, Ms. Discepola would positively encourage T.L. and "would accommodate [T.L.]'s needs by giving [T.L.] short breaks, if necessary, positive reinforcement, and small group time with [the teacher]." *Id.*

The Hearing Officer found that while T.L. was at Lower Merion, T.L.'s "behavioral issues were being successfully managed within the regular education room." HOD ¶ 55. The February 2012, March 2012, June 2012, and May 2013 IEPs all included SDIs to address T.L.'s attention, hyperactivity, and organization in addition to T.L.'s reading, writing, math, and handwriting difficulties. *See* HOD ¶¶ 32, 81.[4] An FBA was completed on August 13, 2013 and included in the September 2013 IEP. HOD ¶ 102. The September 2013 IEP included SDIs to address T.L.'s attention, hyperactivity, and organization as well as SDIs to address anxiety and behavior and social/emotional difficulties. *See* HOD ¶¶ 115, 121. The December 2013 IEP included the SDIs from the September 2013 IEP to address attention, hyperactivity, and organization; anxiety; behavior/social/emotional difficulties and also added additional SDIs to address T.L.'s attention, anxiety, and behavior/social/emotional difficulties. HOD ¶¶ 144–45.

The instant case is more akin to *A.C. ex rel. M.C. v. Board of Education of the Chappaqua Central School District* because T.L. was not subject to certain types of discipline[5] and Defendant appropriately considered the statutory requirements concerning behavioral interventions. More specifically, in the present case, like in *A.C.,* Defendant recognized that T.L.'s behavior did, at times, impede T.L.'s learning and "consider[ed] the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i). Instead of conducting an FBA prior to August 13, 2013, Defendant sought to manage T.L.'s behavior by implementing SDIs aimed at addressing T.L.'s attention, hyperactivity, and organization as well as T.L.'s reading, writing, math, and handwriting difficulties. As explained by Dr. Nure, while T.L. had attention difficulties, the cruxes of T.L.'s issues were academic and thus "special education learning

---

[4] The March 2012 and June 2012 IEPs incorporated the SDIs for attention, hyperactivity, and organization from the February 2012 IEP.
[5] See *Coleman*, 983 F. Supp. 2d at 565 (quoting *Alex R.*, 375 F.3d at 614).

31

support resources were being recommended." Admin. Record, Exh. 6 at 58. Accordingly,

Defendant's "positive behavioral interventions and supports, and other strategies" initially

included significant support with T.L.'s learning difficulties to encourage T.L. to remain on task,

gain confidence, and progress in the classroom through the use of numerous SDIs. Defendant

eventually included a Positive Behavior Support Plan in the September 2013 IEP and December

2013 IEP in addition to numerous SDIs to address T.L.'s learning difficulties. Therefore, the

preponderance of the evidence supports the Hearing Officer's finding that each IEP was

appropriate, particularly in addressing T.L.'s behavioral issues, "and the sufficiency of

[Defendant's] strategies for dealing with this behavior 'is precisely the type of issue upon which

the IDEA requires deference to the expertise of the administrative officers.'" *A.C.,* 553 F.3d at

172–73 (quoting *Grim*, 346 F.3d at 382).

### 2. Remedial Support

Second, Plaintiffs contend that each of the IEPs failed to provide T.L. with "enough

remedial educational support." Mot. for Judgment at 17. Plaintiffs argue that "the Wilson

Reading Program Lower Merion provided T.L. pursuant to its February 2012 IEP was clearly

ineffective in rectifying [T.L.'s] literacy issues." *Id.* at 20. Plaintiffs also argue that "the

remedial programming offered in Lower Merion's June 2012 IEP, May 2013 IEP, and its

December 2013 IEP, is far too limited in terms of Wilson, and is non-existent for both writing

and math." *Id.* at 21. Defendant, however, maintains that all of the IEPs provided to Plaintiffs

were appropriate.

As explained above, "'[a]t a minimum, the IEP must be reasonably calculated to enable

the child to receive meaningful educational benefits in light of the student's intellectual

potential.'" *Ridley Sch. Distr.*, 680 F.3d at 269 (quoting *Chambers*, 587 F.3d at 182). Further,

the IEP must assist the child in receiving meaningful educational benefits in light of the student's "'individual abilities.'" *Id.* (quoting *Ridgewood Bd. of Educ.*, 172 F.3d at 248). The Court must assess "the measure and adequacy of an IEP . . . as of the time it is offered to the student, and not at some later date." *Fuhrmann*, 993 F.2d at 1040.

The Hearing Officer concluded that "[d]espite only a brief 4-month implementation period, [T.L.] made educational progress under the initial IEP." HOD at 28. The Hearing Officer found T.L.'s progress to be "remarkable since during the same period [T.L.] was undergoing trials of psychotropic medications and suffered a badly fractured [limb] which led to pain, discomfort, decreased mobility, school absence and diminished focus on learning." *Id.* At the conclusion of T.L.'s last year at Gladwyne (second grade), Defendant found that "with one-year targets in the area of handwriting, moderate progress was noted after 4 instructional months in the areas of attention to details, independently spacing between words and orienting letters to the line." HOD ¶ 49. Further,

> with one-year targets set at 80% accuracy for decoding and encoding, after 4 instructional months [T.L.] read and spelled CVC words with 100% accuracy, read CVCE words with 90% accuracy and spelled CVCE words with 80% accuracy, read CVVC words with 70% accuracy and spelled CVVC words with 40% accuracy, read CCVVC words with 50% accuracy and spelled CCVVC words with 30% accuracy, and read multisyllabic words with 40% accuracy.

*Id.* ¶ 50. Defendant also observed that

> with one-year targets set at 80%-100% accuracy for sight words, after 4 instructional months [T.L.] progressed as follows: Primer list from baseline of **81%** in February to **94%** accuracy in June; First grade list from baseline of **85%** in February to **98%** accuracy in June; Second grade list from baseline of **70%** in February to **87%** accuracy in June; Third grade list from baseline of **68%** in February to **85%** accuracy in June.

*Id.* ¶ 51 (emphasis added).

Additionally, Defendant found that "with one-year targets set to increase oral fluency rate from 42 wpm to 90 wpm, although [T.L] . . . made some progress after 4 instructional months [T.L.] was inconsistent" and scored less than 67 on his last 8 probes of the school year.  *Id.* ¶ 52. T.L. had "one-year math targets set at 80% . . . correctly solved, [and] after 4 instructional months [T.L.] maintained 90% on problems involving time or money, 100% on story problems requiring addition or subtraction and involving single digit computation."  *Id.* ¶ 53.  Nonetheless, "on the last three trials of the year [T.L.] scored 53% on addition/subtraction story problems and on the last assessment involving four story problems with 2-digit numbers [T.L.] did not solve any correctly."  *Id.*

One of Plaintiffs' principal contentions is that the IEPs were ineffective because T.L. did not progress, as evidenced by the addition of numerous SDIs in the June 2012 IEP as compared to the February 2012 IEP.  Plaintiffs, however, misunderstand the function of an IEP.  An IEP is not automatically defective because it includes more SDIs or more services than that of the preceding IEP.  An IEP is required to be reasonably calculated to enable T.L. to receive meaningful educational benefits in light of T.L.'s intellectual potential and individual abilities. *Ridley Sch. Distr.*, 680 F.3d at 269.  Each time the IEP Team constructs an IEP, it must revise the IEP to address the following:  "(I) any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate; (II) the results of any reevaluation conducted under this section; (III) information about the child provided to, or by, the parents, as described in subsection (c)(1)(B); (IV) the child's anticipated needs; or (V) other matters."  20 U.S.C. § 1414(d)(4)(A)(ii).  Thus, with each revision, "as any team, you continue to try to meet the needs. . . . you assess and make a determination as to whether that IEP is meeting the needs that were identified."   Admin. Record, Exh. 5 at 42.

Additionally, as explained by Ms. Schubert, a special education teacher at Lower Merion, over time she collected more data and "more was shared. . . . [thus] as the progress reports increased at [the Private School], so did [her] IEP. . . . the first IEP written after the first trimester was less robust because there was less data provided."  Admin. Record, Exh. 6 at 37. Furthermore, the "measure and adequacy of an IEP" must be assessed at the time the IEP was offered to Plaintiffs, not in hindsight.  Defendant increased the  SDIs and services offered to T.L. in light of more information that provided to Defendant from the Private School and in light of T.L.'s progress.  Each IEP was constructed to provide T.L. with meaningful educational benefits, in light of all of the data before the team at the time it was constructed, with respect to T.L.'s intellectual potential and T.L.'s abilities.  Thus, the preponderance of the evidence supports the Hearing Officer's finding that each IEP was appropriate and not ineffective because it included more SDIs to assist T.L.

Plaintiffs also contend that Defendant did not provide T.L. with effective Wilson instruction as well as writing and math remedial programs.  In terms of Math instruction, Ms. Schubert explained that the math program T.L. would have been instructed in for the 2012-2013 school year was "Investigations."  Admin. Record, Exh. 6 at 21.  Specifically, "[t]he curriculum teaches students to use everyday skills when solving math problems. . . [and is] geared more toward problem-solving and computation."  *Id.*  For students that had disabilities, the curriculum manuals provided "differentiated instructions; so if a student is considered on grade level, then you use part of the program for that. If a student is considered needing help, remedial help, then you use that part of the program.  And then just like students that are advanced."  *Id.* at 21–22. The same math program would be used for the 2013-2014 school year.  *Id.* at 22.  Instead of using the term "remedial" to describe specific programming at Lower Merion, Ms. Schubert

indicated that she preferred to use the terminology "'[s]pecific needs in math.'"  *Id.*  Lower

Merion's writing program, Being a Writer, "also differentiated for students depending on their

needs and where their functioning is."  *Id.*

Plaintiffs' second argument is also without merit.  Each IEP included SDIs to address

reading, math, and handwriting.  The May 2013 IEP, September 2013 IEP, and December 2013

IEP included special education services for math, language arts, and reading to ensure that T.L.

was receiving meaningful educational benefits in light of T.L.'s difficulties and intellectual

potential to progress with these three subjects in particular.  *See* HOD ¶¶ 89, 126, 148.  Further,

since the February 2012 IEP, T.L. was to receive Wilson instruction, denoted "multisensory,

systematic, rule-based program for reading and spelling" from Defendant.  HOD ¶ 30.  Parents

wanted Defendant to adopt the Private School program, as evidenced by their contention that

"[i]nstead of the limited Wilson services Lower Merion offered, [the Private School] offered a

program where T.L.'s Wilson program could be implemented and re-enforced throughout the

entire school day by educational professionals that specialize in dealing with children with

language based learning disabilities."  Mot. for Judgment at 21–22.  However, the "parents do

not have a right to compel a school district to provide a specific program or employ a specific

methodology in educating a student."  *W.H.*, 954 F. Supp. 2d at 324.  Rather, Defendant must

have provided T.L. with meaningful educational benefits in light of T.L.'s intellectual potential

and individual abilities.  Defendant did provide T.L. with meaningful educational benefits

through the provision of numerous SDIs, special education services, and occupational therapy to

address T.L.'s addressing reading, handwriting, and math difficulties so that T.L. may progress

in light of T.L.'s potential.  Thus, the preponderance of the evidence supports the Hearing

Officer's finding that each IEP was appropriate.

### 3. ESY Programming

Lastly, Plaintiffs claim that "[t]he Extended School Year programming offered to T.L. during the Summers of 2012, 2013, and 2014, was also inappropriate." Mot. for Judgment at 22. Plaintiffs allege that "[i]nitially a major portion of the programming consisted of tutoring that was neither tied to a specific location or a specific time." *Id.* Further, "Lower Merion made no offer of transportation to these tutoring sessions." *Id.* Plaintiffs maintain that "Lower Merion's assertion that it would have provided transportation if requested is contrary to Federal Law and controlling Federal Regulations in that transportation is a related service, and has to be provided whether it is requested or not." *Id.* at 23. Plaintiffs also contend that "the classroom based services in reading, writing, and math, Lower Merion offered during the Summers of 2013 and 2014 were to be delivered without any appropriate Specifically Designed Instruction and/or related Services that T.L. clearly required." *Id.*

In contrast, Defendant contends that Plaintiffs are "not entitled to transportation costs expended to transport T.L. to [the Private School] during the summer of 2013 because [K.L. and K.L.] had removed T.L. from the District and had not scheduled T.L. for services." Def. Resp. at 49. Additionally, Defendant maintains that its "programs for ESY were appropriate; therefore this Court must not reimburse Plaintiffs for transporting their child to a private program they unilaterally selected." *Id.*

The IDEA requires that

(1) Each public agency must ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.
(2) Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.
(3) In implementing the requirements of this section, a public agency may not—

(i) Limit extended school year services to particular categories of disability; or
(ii) Unilaterally limit the type, amount, or duration of those services.

34 C.F.R. § 300.106(a).  In addition to extended year services, in order to provide a FAPE, a

school district must also provide "related services."  20 U.S.C. § 1401(9).  The IDEA defines

related services as "transportation, and such developmental, corrective, and other supportive

services  . . . as may be required to assist a child with a disability to benefit from special

education."  20 U.S.C. § 1401(26).  The IEP should include "a statement of the . . .

related services and supplementary aids and services . . . to be provided to the child, or on behalf

of the child."  20 U.S.C. § 1414(d)(1)(A)(i)(IV).  Additionally, the IEP must include "a specific

statement of a student's present abilities, goals for improvement of the student's abilities,

services designed to meet those goals, and a timetable for reaching the goals by way of the

services.'"  *D.S.*, 602 F.3d at 557.

In the present case, Defendant offered Plaintiffs ESY services for T.L. for the summers of

2012, 2013, and 2014.  In April 2012, Defendant found that T.L. "was determined to be eligible

for ESY in Reading-Decoding Fundations[,]" a Wilson reading program.  HOD ¶¶ 41, 41 n.11.

Additionally, "the summer 2012 ESY was designed to address decoding and spelling single and

multisyllabic words containing word patterns or families."  *Id.* ¶ 40.  Thus, in the March 2012

IEP, "[t]he recommended ESY program included services for the summer of 2012, specifically:

'Reading tutor for 45 minutes, 3x a week for 6 weeks; Hours between 8:00am to 3:30pm

Monday through Friday; Location: to be determined mutually by the Parents and the tutor.'"  *Id.*

¶ 42 (quoting P-7, P-15).  The May 2013 IEP

> proposed an ESY program consisting of [individual] tutoring in reading four
> times a week for 45-minutes each session for eight weeks, [individual] writing
> tutoring three times a week for 30-minutes each session for eight weeks. The IEP
> also provided for ESY instruction in reading, writing, and mathematics in the

learning support classroom environment three days per week, 4 hours per day from June 25, 2013 through August 1, 2013.

*Id.* ¶ 91.  The May 2013 IEP offered Plaintiffs transportation "to and from the designated elementary school building for ESY programming in the learning support classroom." *Id.* ¶ 92. The May 2013 IEP also "reference[d] back to the goals put forth for the 2012-2013 school year."

*Id.* ¶ 93.  Lastly, the December 2013 IEP

> proposed an ESY program consisting of [individual] tutoring in reading four times a week for 45-minutes each session for eight weeks, [individual] writing tutoring three times a week for 30-minutes each session for eight weeks. The times of delivery of this ESY component were to be worked out between the family and the tutor[s].  The IEP also provided for ESY instruction in reading, writing, and mathematics in the learning support classroom environment three days per week, 4 hours per day from June 25, 2014 through August 1, 2014. Transportation was to be provided for this component of the ESY program for summer 2014.

*Id.* ¶ 156.  The December 2013 IEP's "ESY goals referenced back to the goals/objectives addressed during the 2013-2014 school year."  *Id.*  ¶ 157.  K.L. and K.L. rejected all of Defendant's offered ESY programs.  HOD ¶¶ 64, 94, 158.

Plaintiffs contend that Defendant provided insufficient ESY programming because "a major portion of the programming consisted of tutoring that was neither tied to a specific location or a specific time. . . . [and] Lower Merion made no offer of transportation to these tutoring sessions."  Mot. for Judgment at 22.  In particular, K.L. (mother) testified that she declined the ESY programming because

> [t]he hours given . . . were between 8 o'clock and 3 or 4 o'clock in the afternoon. It was impossible to get a child out of their daytime day care to a location, back from the location.  It required essentially almost three – at least two hours out of my day or a parent's day to get [T.L.] away for 45 minutes and then get [T.L.] back.

Admin. Record, Exh. 7 at 21.  Plaintiffs, however, never availed themselves of the tutoring provided in the ESY programming.  Therefore, it is uncertain if the tutoring would require K.L.

(mother) or K.L. (father) or another to transport T.L. to and from tutoring.  Thus, while it is true

that the IDEA requires Defendant to provide related services, including transportation; it is also

true that Defendant cannot offer transportation to a theoretical location.   20 U.S.C. §§ 1401(9),

(26).   There is no evidence in the record that Plaintiffs contacted a tutor and the only mutually

agreeable location for the parties would require T.L. to be transported.  Rather, the March 2012,

May 2013, and December 2013 IEPs all provided for the parties to determine a location as well

as a time.  Therefore, the location and time were to be reasonably beneficial for Plaintiffs as well

as the tutor.  Plaintiffs and the tutor could have reached an agreement for T.L. to be tutored at

T.L.'s summer daycare or at Plaintiffs' home. Furthermore, there is no evidence that if T.L.

required transportation to tutoring that Defendant would deny transportation. Thus, based upon

the record before the Court, the IEPs were sufficient and did not deny Plaintiffs of any related

service under the IDEA.

Plaintiffs also argue that the ESY programming was insufficient because "the classroom

based services in reading, writing, and math, Lower Merion offered during the Summers of 2013

and 2014 were to be delivered without any appropriate Specifically Designed Instruction and/or

related Services that T.L. clearly required." Mot. for Judgment at 23.  This argument, however, is

without merit.  The May 2013 IEP explained the goals for the 2013 ESY program for T.L.

Admin. Record, Exh. 8 at P-9 pg. 47. Specifically, T.L.'s goals were the following:

**Reading:**
1. Given words in isolation or context, [T.L.] will correctly decode and spell
single and multisyllabic words containing word patterns or families with at least
80% accuracy for three consecutive probes.
2. Given a passage to read at [T.L.'s] instructional reading level, [T.L.] will
be able to identify evidence from the text to support generalizations in order to draw
inferences.

3. Given a second/third grade reading passage where every seventh word is replaced with a choice of three and asked to read silently, [T.L.] will demonstrate comprehension by circling at least 5 responses in 3 minutes.
**Math:**
4. Given an 8 minute concept/application probe at the 3rd grade level, [T.L.] will solve problems accurately to score an 11.
**Writing:**
5. [T.L.] will improve the quality of writing to score a 3 using the PA Writing Rubric in the areas of content, focus, organization, style, and conventions.

*Id.* The December 2013 IEP implemented the same goals for the 2014 ESY program as the 2013 ESY program for T.L. Admin. Record, Exh. 8 at P-11 pg. 67.

The IDEA requires Defendant to develop an IEP that is "'reasonably calculated to enable [T.L.] to receive meaningful educational benefits in light of [T.L.'s] intellectual potential.'" *Ridley Sch. Distr.*, 680 F.3d at 269 (quoting *Chambers*, 587 F.3d at 182). The IEP must also assist T.L. in receiving meaningful educational benefits in light of [T.L.'s] "'individual abilities.'" *Id.* (quoting *Ridgewood Bd. of Educ.*, 172 F.3d at 248). Defendant's ESY program had clear objectives and measurable targets for T.L. to improve in reading, math, and writing—all subjects which T.L. exhibited difficulty. Defendant provided an ESY program that included services for in-school instruction, in addition to tutoring, that was reasonably calculated to enable T.L. to receive meaningful educational benefits so that T.L. may progress in reading, writing, and math in light of T.L.'s prior progress reports and latest evaluations upon the completion of the ESY program. Accordingly, the preponderance of the evidence supports the Hearing Officer's finding that each IEP was appropriate.

Therefore, Plaintiffs fail to demonstrate that Defendant did not provide T.L. with meaningful educational benefits that were reasonably calculated based upon T.L.'s intellectual potential and individual abilities. Furthermore, Plaintiffs fail to demonstrate that Defendant did not provide a FAPE or "educational instruction specially designed to meet the unique needs of

[T.L.], supported by such services as are necessary to permit [T.L.] 'to benefit' from the instruction.'" *Ridley Sch. Distr.*, 680 F.3d at 268–69.  Rather, the evidence supports the conclusion that Defendant consistently provided IEPs that were reasonably calculated to provide T.L. with meaningful educational benefits in light of T.L.'s progress and academic challenges. Accordingly, the preponderance of the evidence supports the Hearing Officer's determination that all of Defendant's IEPs were appropriate and that Defendant provided Plaintiffs with a FAPE.

Since Plaintiffs failed to demonstrate that Defendants deprived Plaintiffs of a FAPE, the Court need not discuss whether the alternate private placement was appropriate or whether the equities balance in favor of Plaintiffs.   Instead, the Court will address whether Plaintiffs are entitled to a judgment as a matter of law under § 504.

### B.  Section 504

Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  Section 504 "is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements, like the IDEA." *P.P.*, 585 F.3d at 735.  Section 504 "requires school districts receiving federal funding to provide a FAPE to each qualified handicapped person within the recipient's jurisdiction." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 274 (3d Cir. 2014).  A school district provides "an 'appropriate' education under the Rehabilitation Act . . . [by] reasonably accommodat[ing] the needs of the

handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Ridley Sch. Distr.*, 680 F.3d at 280. Accordingly, in order to succeed under § 504, Plaintiffs must establish that: "(1) [T.L.] was disabled; (2) [T.L.] was 'otherwise qualified' to participate in school activities; (3) [Defendant] received federal financial assistance; and (4) [T.L.] was excluded from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program." *Blunt*, 767 F.3d at 274–75 (footnote omitted). Plaintiffs "may use the same conduct as the basis for claims under both the IDEA and the RA." *Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007).

The Court finds that Plaintiffs also cannot succeed under § 504. In order to succeed under § 504, Plaintiffs were required to demonstrate, *inter alia*, that Defendant "excluded [T.L.] from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program." *Blunt*, 767 F.3d at 274–75. However, as explained above, Defendant did provide T.L. a FAPE and thus did not exclude T.L. from participation in or deny the benefits of Defendant's educational program. Further, Defendant did not subject T.L. to discrimination under the program. Rather, Defendant provided T.L. with meaningful educational benefits that were reasonably calculated based upon T.L.'s intellectual potential and individual abilities. Therefore, because Defendant provided T.L. a FAPE, Plaintiffs claim under § 504 must fail.

## VI.    CONCLUSION

For the reasons explained herein, Plaintiffs fail to demonstrate that they are entitled to judgment as a matter of law pursuant to the IDEA and § 504 because Defendant provided a free

appropriate public education to Plaintiffs.  Accordingly, this Court DENIES Plaintiffs' Motion for Judgment on the Administrative Record.   An appropriate order follows.